## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| **SSC8, LLC and WMAC 2014, LLC,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SALLY L. DANIEL, in her official capacity as Hernando County Tax Collector, LISA CULLEN, in her official capacity as Brevard County Tax Collector, DAVID W. JORDAN, in his official capacity as Lake County Tax Collector, BRUCE VICKERS, in his official capacity as Osceola County Tax Collector, J. R. KROLL, in his official capacity as Seminole County Tax Collector, CHRIS CRAFT, in his official capacity as St. Lucie County Tax Collector, and WILL ROBERTS, in his official capacity as Volusia County Tax Collector,**<br><br>**Defendants.** | **Civil Action No.** |

## COMPLAINT WITH PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF REQUESTED

Plaintiffs SSC8, LLC ("SSC8") and WMAC 2014, LLC ("WMAC") bring this action for preliminary and permanent injunctive relief against SALLY L. DANIEL, Hernando County Tax Collector, LISA CULLEN, Brevard County Tax Collector, DAVID W. JORDAN, Lake County Tax Collector, BRUCE VICKERS, Osceola

County Tax Collector, J. R. KROLL, Seminole County Tax Collector, CHRIS CRAFT, St. Lucie County Tax Collector, and WILL ROBERTS, Volusia County Tax Collector, each in their official capacity.

*Note on related case:* This lawsuit is substantially the same as case brought by Plaintiffs in this Court in 2021 against the Tax Collectors of Hillsborough and Pinellas Counties, Case No. 8:21-cv-00407-WFJ-CPT, discussed *infra* at Paragraphs 26 to 33.  The case was dismissed after the Defendants agreed to take the action that Plaintiffs were seeking as relief in the lawsuit.

### Jurisdiction and Venue

1.

This is an action for injunctive relief pursuant to 28 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. § 1343.  This Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.

Venue lies in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, all of the Defendants are residents of the State of Florida and at least one of the Defendants resides in this judicial district.

## Parties

3.

SSC8 is a Florida limited liability company with its principal place of business in Miami Lakes, Florida.  SSC8 has in the past and anticipates in the future bidding on tax certificates that are auctioned by Defendants.

4.

WMAC is a Missouri limited liability company with its principal place of business in Atlanta, Georgia.  WMAC has in the past and anticipates in the future bidding on tax certificates that are auctioned by Defendants.

5.

Defendants are the tax collectors in their respective counties.  They are being sued in their official capacities for prospective declaratory and injunctive relief.  As tax collectors, Defendants' responsibilities include overseeing all aspects of tax collection handled by their respective tax collector's office, including the annual tax certificate sales that are the subject matter of this lawsuit.

## Overview of the Sale of Tax Certificates in Florida

6.

The tax collector of a county in Florida has the authority and obligation to collect delinquent property taxes on real property located within the county, and to collect interest and costs by the sale of tax certificates.  A tax certificate, also known as a tax lien, is a statutory lien that secures unpaid delinquent real property

taxes and which attaches to specific parcels of taxable real property owned by the delinquent taxpayer.

7.

Florida statutes require tax collectors like the Defendants to sell tax certificates at public auctions, which are held on or before June 1 of each year.  Tax certificates are sold at auction to the bidder willing to pay the amounts due to the tax collector and who will agree to receive the lowest rate of interest on any effort to redeem.  After the sale of a tax certificate, the taxpayer has two years to redeem by paying the past-due taxes plus interest.  If the taxpayer fails to redeem the property within two years, the purchaser of the tax certificate can then apply for a tax deed to the property.

8.

The auctioning of tax certificates enables local governments to timely collect taxes to fund expenditures.  The sale also helps delinquent taxpayers by allowing their unpaid taxes to accrue interest at the rate awarded to the winning bidder, which in most cases falls far below the 18% statutory delinquency rate.

9.

By law, the lowest interest rate that may be bid (other than zero) is .25% (one-quarter of one-percent) per annum.  At the annual public auctions of tax certificates conducted by Defendants, the vast majority of bids for tax certificates result in a tie among bidders who are willing to accept a .25% interest rate.

10.

As to the procedure for resolving tie bids, Florida Statutes Section 197.432(6) provides, in relevant part:

> If multiple bidders offer the same lowest rate of interest, the tax collector shall determine the method of selecting the bidder to whom the certificate will be awarded. Acceptable methods include the bid received first or use of a random-number generator.

11.

Defendants use a "random-number generator" as the method to select the winner among tie bids.

### Defendants' Group Bidding Rules Allow Sham Auctions

12.

The random-number lottery is supposed to ensure that every bidder has an equal chance to be awarded a tax certificate in the event of a tie bid.

13.

Defendants, however, have established a set of rules in each of their counties ("the Group Bidding Rules") that make a mockery of the tax certificate auction process and ensure that legitimate independent bidders, like Plaintiffs, have no chance to be awarded tax certificates in the event of a tie.

14.

The Group Bidding Rules allow a "Master Bidder" to replicate itself by creating literally hundreds of thousands of wholly owned sham entities formed for

the sole purpose of bidding on tax certificates.[1] The Master Bidder then causes its hundreds of thousands of affiliated sham entities to bid on the tax certificates, inevitably resulting in multiple tie bids. The Defendant Tax Collectors then "randomly" select the winner but given that Master Bidders have flooded the auction with their affiliated sham entities and have tens of thousands of bids for each legitimate, independent bid made by bidders like the Plaintiffs, the random selection of the winner will almost always result in an award to a Master Bidder. Defendants facilitate this sham with a number of rules and policies that, individually and in combination, violate Florida law and violate Plaintiffs' constitutional rights.   These rules and policies are explained in the next paragraphs.

15.

First, Defendants allow the Master Bidders to replicate themselves by recognizing, as legitimate "persons" entitled to bid on tax certificates, sham entities that have no assets, employees, bank accounts, or business – entities existing on paper only, formed for the sole purpose of gaming the tax certificate lottery system. The only thing that Defendants require that these sham entities possess is an IRS Employer Identification Number, called an "EIN."

---

[1] "Master Bidders" are referred to as "Primary Bidders" on the two main auction websites, which refer to their sham subsidiaries as "Affiliate Bidders" or "sub-accounts."

16.

For a time, it was possible for a single corporation or individual to obtain an unlimited number of EINs in an extremely inexpensive, highly automated on-line process. Many bidders did so, obtaining literally hundreds of thousands of EINs to assign to sham entities formed for the sole purpose of bidding on tax certificates in Florida under the Defendants' Group Bidding Rules.

17.

The IRS has now clamped down on this abuse and revised its EIN application and issuance process to make it impossible to obtain numerous EINs. The IRS now bans the use of EIN numbers for the purpose of bidding on tax certificates with remarkably specific instructions: "Employer Identification Numbers are issued for purposes of tax administration and are not intended for participation in any other activities (e.g., tax lien auction of sales, lotteries, etc.)"

18.

Defendants, however, still allow Master Bidders to use the hundreds of thousands of sham entities that obtained and use EINs contrary to IRS rules. Independent bidders like Plaintiffs, even if they were inclined to try to create numerous sham entities to bid on tax certificates, are not permitted to do so.

19.

The Group Bidding Rules also impose a deposit requirement upon bidders that drastically favors Master Bidders. Before being allowed to bid, every bidder must first pay Defendants a deposit equal to ten percent of their intended

purchases.  In determining the amount of intended purchases, however, the Group Bidding Rules aggregate all of a Master Bidder's affiliates, drastically reducing the amount of the deposit, as the following example illustrates.  Suppose Plaintiff WMAC and a Master Bidder each intended to purchase $5 million in tax certificates.  Suppose further that the Master Bidder controlled 500,000 sham entities, each with their own EIN and each authorized, under the Group Bidding Rules, to bid upon and be awarded a tax certificate.  Under the Group Bidding Rules, both Plaintiff WMAC and the Master Bidder would pay the same deposit of $500,000, or 10% of their intended $5 million purchase.  Under the Group Bidding Rules, the Master Bidder's $500,000 deposit would satisfy the deposit requirement for all of its 500,000 sham entities, resulting in a deposit of only $1 per sham entity.  Thus, although a sham entity has the same chance of being awarded an auctioned tax certificate as WMAC, WMAC in this example must deposit $500,000 and each sham entity need only deposit $1.

20.

Finally, the Defendants – unlike most Florida tax collectors – do not enforce rules against collusive bidding.  Indeed, the concept of non-collusion is antithetical to group bidding because the knowledge of each member of the group is imputed to the Master Bidder.  The Master Bidder, as a matter of fact and as a matter of law, knows and makes every bid of each of its sham entities, which exist only on paper in any event.  By not having, or not enforcing, any anti-collusion rules, Defendants defeat fair competition in the auction process.

21.

In 2021, in each of the Defendant counties, Master Bidders controlled over 3.5 million sham subsidiaries that each made identical bids on tax certificates, making a complete mockery of the counties' "random" number lottery system for resolving tied bids.  In Brevard, Lake, Osceola, Volusia, Hernando and Seminole Counties[2], Plaintiff SSC8 made tie bids at a .25% interest rate on a total of 4,447 tax certificates, but, after the counties ran their random number generator to decide the winner of the tied bids, was not awarded a single tax certificate. Similarly, in these six counties, WMAC made tied bids at a .25% interest rate on a total of 6,362 tax certificates, but also was not awarded a single tax certificate. Since SSC8 and WMAC were competing against literally millions of sham bids made by the Master Bidders, they had no realistic chance of winning any of the thousands of lotteries that the counties ran using their random number generator.

22.

The results in St. Lucie County are the same as in the other six Defendant counties: a handful of Master Bidders controlled over 3.5 million sham affiliates and made hundreds of thousands of identical .25% interest rate bids on the same tax certificates and, in at least 99% of the cases, were awarded the tax certificates after St. Lucie County resolved the ties using its random number generator.

---

[2] Plaintiffs did not bid in St. Lucie County in 2021 but intend to do so in 2022.

23.

The auction results for particular individual tax certificates also show how the Group Bidding Rules deprive Plaintiffs and other independent bidders of a fair chance of being awarded a tax certificate in the event of a tie bid.  For example, in Lake County, tax certificate number 4582 had a face amount of $18,965.93. Plaintiff SSC8 made the low bid on certificate number 4582 at a .25% interest rate. However, Master Bidders, which had flooded the auction with their sham affiliates, made over 3.7 *million* .25% bids on certificate number 4582, depriving Plaintiff SSC8 of any realistic chance of winning the lottery.  Master Bidder Keys Funding, taking advantage of Lake County's Group Bidding Rules, submitted 260,171 identical bids for certificate number 4582 and was the winner of the "random" lottery for  that certificate.

24.

In Osceola County, there were 3.7 million identical low .25% bids on a single tax certificate (number 1762), but 549,309 of those identical bids were placed by a single Master Bidder, TLGFY, LLC, and the sham entities that it controlled. Plaintiff SSC8, because it did not create sham subsidiaries to make identical bids on the tax certificates, made a single bid, also at .25%. TLGFY, not surprisingly, having been allowed by Osceola County to flood the auction and game the lottery, was the winner of the random number lottery and was awarded certificate number 1762.

25.

Defendants have no legitimate or reasonable basis for the Group Bidding Rules: giving the Master Bidders such an unfair advantage in the random selection process does not do the Defendants, or the citizens of the Defendants' counties, any good.

## The *Hillsborough* Litigation

26.

That the Group Bidding Rules serve no legitimate governmental interest is evidenced by the experience of Hillsborough and Pinellas Counties in the past two annual auctions.  Both Hillsborough and Pinellas Counties allowed group bidding through their 2020 auction.  On February 22, 2021, Plaintiffs SSC8 and WMAC filed suit against the Hillsborough and Pinellas County Tax Collectors in this Court, Case No. 8:21-cv-00407-WFJ-CPT ("*Hillsborough*"), alleging that their Group Bidding Rules violated federal due process and equal protection and violated Florida law.  (*Id.,* Doc. 1).

27.

On March 3, 2021, Plaintiffs moved to preliminarily enjoin the enforcement of Hillsborough and Pinellas Counties' Group Bidding Rules.  (*Id.,* Doc. 16).  However, before the motion could be heard, on March 18, 2021, Plaintiffs and Defendants Hillsborough and Pinellas County Tax Collectors entered into a Joint Stipulation in which the Defendants recited that they had "abandoned the prior Group Bidding Guidelines that form the subject of the pending litigation, and

instead implemented a single bidder policy for upcoming tax certificate sales, including the June 1, 2021, tax certificate sales." (*Id.,* Doc. 23).  The same day, District Judge William F. Jung granted the parties' joint motion and dismissed the case. (*Id.* Doc. 24).

28.

Consistent with the Joint Stipulation, for the June 1, 2021 auction, the Hillsborough and Pinellas County Tax Collectors abandoned their Group Bidding Guidelines and implemented a single bidder policy and non-collusion rules.

29.

The results from the June 2021 auction demonstrate how the abandoned Group Bidding Rules served no governmental interest.  Again, the purpose of the auction from the Tax Collectors' perspective is to sell the highest percentage of tax certificates and to sell those at the lowest average interest rate.  In both counties, in 2021 the counties sold virtually all of the tax certificates that were auctioned, as they had the year before (in each county, over 99.5%), thus meeting the defendants' objective of collecting taxes.  In fact, both counties sold a slightly higher percentage of tax certificates in 2021 than it had in 2020 (Hillsborough – 99.69% (2021) to 99.39% (2020); Pinellas, 99.99% (2021) and 99.95% (2020)).

30.

Better still, in each county, the certificates were sold at a *lower* weighted average interest rate in 2021 than in 2020, thus benefitting the counties' taxpayers.

(Hillsborough .31% (2021) and .35% (2020); Pinellas .27% (2021) and .33% (2020)).

31.

Thus, in both counties, the relief that Plaintiffs seek in this case materially advanced the two governmental objectives of the tax certificate auction – collecting taxes and giving taxpayers a low interest rate.

32.

The Hillsborough and Pinellas County auctions in 2021, in which the counties abandoned the Group Bidding Rules in favor of single bidder policies, also were more fair and rational.  Gone were the millions of sham bids on the same tax certificate from Master Bidders trying to game the system, replaced by bids from many real bidders who otherwise avoid auctions where they have no realistic chance of success.  More real bidders resulted in better sale results for both counties.  As expected, the vast majority of bids were again at the .25% interest rate and resulted in ties.  But in 2021, tie bids were resolved in a bona fide running of the random number generator to select the winner among a few dozen actual legitimate bidders, not among the millions of sham entities that were created for the sole purpose of gaming the auction process.  Thus, the single bidder rules, not the Group Bidding Rules, advance the stated governmental interest of "ensuring due process and public confidence in a uniform, fair . . . collection of property taxes." *See* § 197.603, Florida Statutes.

## The *Hillsborough* Litigation: Post-Script

### 33.

After the settlement of the *Hillsborough* litigation, Plaintiffs, through counsel, wrote to 23 Florida county tax collectors, including each of the Defendants, explaining the *Hillsborough* litigation and its beneficial resolution and requesting that each of the tax collectors abandon Group Bidding Rules in favor of single bidder policies.  Tax collectors in several counties responded by making the change.  The Defendants in this case refused to do so.

## Claims

### 34.

Defendants' maintenance of the sham auction process through the enforcement of their Group Bidding Rules causes Plaintiffs actual harm by taking from them their chance of being awarded a fair share of tax certificates with respect to which tie bids are made.

### 35.

Plaintiffs intend to bid on tax certificates in each of the Defendants' counties in 2022 and years following.  Unless injunctive relief is granted, Defendants, in violation of Florida law and in violation of Plaintiffs' rights under the United States Constitution, will continue to cause Plaintiffs' actual injury through their maintenance of the sham auctions enabled by their Group Bidding Rules.

## Count One: 42 U.S.C. § 1983 - Violation of Substantive Due Process

36.

Plaintiffs incorporate Paragraphs 1 through 35 of this Complaint by reference as if fully restated herein.

37.

The Group Bidding Rules deprive Plaintiffs of substantive due process because they constitute an arbitrary and capricious exercise of power having no rational relationship to any legitimate state interest.

38.

Plaintiffs have a protectable interest in having a fair opportunity to purchase tax certificates. The Group Bidding Rules deprive Plaintiffs of that opportunity.

39.

The Group Bidding Rules cause the random selection process among tie bids to be a sham and deprive Plaintiffs of their opportunity to be awarded their fair share of tax certificates.

40.

Defendants have no legitimate or reasonable basis for the Group Bidding Rules: giving the Master Bidders such an unfair advantage in the random selection process does not do the Defendants, or the citizens of the Defendants' counties, any good. In fact, conducting the Group Bidding Rules damages the Defendants' counties by discouraging potential unaffiliated bidders from participating in the

auctions because they have no realistic chance of being awarded tax certificates in the event of a tie.

41.

The Group Bidding Rules also are contrary to the stated governmental interest of "ensuring due process and public confidence in a uniform, fair . . . collection of property taxes." *See* § 197.603, Florida Statutes.

42.

The Group Bidding Rules are also completely contrary to the laws and policies of the IRS. The IRS issues EINs for the purpose of tax administration only and specifically prohibits their use for bidding on tax certificates. Ignoring this sound policy, Defendants not only allow Master Bidders to use EINs for an unauthorized purpose, by doing so they favor Master Bidders over Independent Bidders, like the Plaintiffs, who do not use EINs improperly.

43.

Plaintiffs are accordingly entitled to an injunction prohibiting Defendants from enforcing the Group Bidding Rules.

## Count Two: 42 U.S.C. § 1983 - Violation of Equal Protection

44.

Plaintiffs incorporate Paragraphs 1 through 35 of this Complaint by reference as if fully restated herein.

45.

The valuable opportunity to be awarded a tax certificate is something that Defendants must, under the Equal Protection Clause of the Fourteenth Amendment, either distribute equally or have a rational reason for not doing so.

46.

The Group Bidding Rules unlawfully discriminate between independent bidders like the Plaintiffs ("Independent Bidders"), on the one hand, and Master Bidders and their sham affiliates, on the other hand.

47.

By recognizing Master Bidders' affiliated sham entities as separate bidders entitled to be awarded a tax certificate, the Group Bidding Rules unlawfully disadvantage Independent Bidders by not giving them any fair opportunity to be awarded a tax certificate in the event of a tie bid.

48.

The Group Bidding Rules also disadvantage Independent Bidders by allowing Master Bidders and their affiliated sham entities to bid on tax certificates without requiring each sham entity to post a deposit equal to 10% of their intended purchase, even though Defendants give each sham entity the opportunity to be awarded a tax certificate.

49.

Defendants have no reasonable basis for discriminating between Independent Bidders and Master Bidders.  To the contrary, the Group Bidding

Rules cause the tax certificate auctions in the Defendants' counties harm by discouraging new bidders from participating in the auctions because (a) almost all bids result in a tie and (b) they have no realistic chance of being awarded tax certificates in the event of a tie bid because of the number of sham entities affiliated with Master Bidders.

50.

The Group Bidding Rules are also completely contrary to the laws and policies of the IRS.  The IRS issues EINs for the purpose of tax administration only and specifically prohibits their use for bidding on tax certificates.  Ignoring this sound policy, Defendants not only allow Master Bidders to use EINs for an unauthorized purpose, by doing so they favor Master Bidders over Independent Bidders, like the Plaintiffs, who do not use EINs improperly.

51.

The Group Bidding Rules also are contrary to the stated governmental interest of "ensuring due process and public confidence in a uniform, fair . . . collection of property taxes."  *See* § 197.603, Florida Statutes.

52.

The Group Bidding Rules violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

53.

Plaintiffs are accordingly entitled to an injunction prohibiting Defendants from enforcing the Group Bidding Rules.

## Count Three: Violation of Florida Law - Using an Unacceptable Method of Selecting Winner in the Event of a Tie

54.

Plaintiffs incorporate Paragraphs 1 through 35 of this Complaint by reference as if fully restated herein.

55.

Section 197.432(6). Florida Statutes, states: "If multiple bidders offer the same lowest rate of interest, the tax collector shall determine the method of selecting the bidder to whom the certificate will be awarded.  Acceptable methods include the bid received first or use of a random-number generator."

56.

Florida law further defines "random-number generator" as "a computational device that generates a sequence of numbers that lack any pattern and is used to resolve a tie when multiple bidders have bid the same lowest amount by assigning a number to each of the tied bidders and randomly determining which one of those numbers is the winner." *See* Section 197.102(1)(e), Florida Statutes.

57.

Defendants' method of selecting the winning bidder using the random-number generator violates Florida law because it does not select the winning bid among "multiple bidders."  It treats bids from each member of a bidding group as a separate bid, each entitled to a chance at the award.  But there is nothing separate, or "multiple," about the bids that are generated by all of the affiliated members of a bidding group: the Master Bidder causes each affiliate to make the

bid, knows what the bids will be (for the Defendants do not prohibit collusive bidding), pays the deposit for every bidder, and ends up paying for the tax certificate if any is ultimately awarded.

58.

A Master Bidder that makes the identical bid through thousands of affiliated members of the bidding group is not making "multiple bids" under Section 197.432(6); it is making a single bid.  By recognizing bids from each member of a bidding group as a separate bid for purposes of the random selection of the winning bidder, Defendants, in violation of Section 197.432(6), are not using an acceptable method of selecting the bidder to whom the certificate will be awarded.

59.

Plaintiffs are accordingly entitled to an injunction prohibiting Defendants from treating affiliated members of a bidding group as separate bidders, each entitled to the same chance of an award, in the process of determining to whom a certificate will be awarded in the event of a tie bid.

**Count Four: Violation of Florida Law - Unreasonable Deposits**

60.

Plaintiffs incorporate Paragraphs 1 to 35 of this Complaint by reference as if fully restated herein.

61.

Section 197.432(7) states: "The tax collector may require payment of a reasonable deposit from any person who wishes to bid for a tax certificate."

Page 20

62.

For a deposit to be "reasonable" under Section 197.432(7), the deposit has to be fairly and reasonably assessed so that similarly situated bidders pay the same amount or at the same rate.  For example, if applied to every bidder who would be given the opportunity to be awarded a certificate in the event of a tie, a requirement of a deposit of at least 10% of the bidder's anticipated purchases would be a reasonable deposit under Section 197.432(7).  If a deposit of at least 10% of the anticipated purchases were required of some bidders, but not of other bidders, the deposit would not be reasonable under Section 197.432(7).

63.

Defendants require Plaintiffs and other independent bidders to make a deposit of at least 10% of the Plaintiffs' intended purchases.  Defendants do not, however, require each of the affiliated bidders to make a deposit of 10% of that bidders' intended purchases.  Instead, Defendants allow Master Bidders to satisfy the deposit requirement for all of its affiliates in the aggregate, resulting in a deposit cost that is a fraction of the cost, per entity entitled by the Defendants to be awarded a tax certificate, as the cost levied upon Independent Bidders like the Plaintiffs.  Defendants' deposit requirement, therefore, is not reasonable and therefore is in violation of Section 197.432(7).

64.

Plaintiffs are accordingly entitled to an injunction prohibiting Defendants from allowing Master Bidders to satisfy the deposit requirement by making a

deposit for its affiliates that is less than the deposit that is being charged to Independent Bidders, like the Plaintiffs.

WHEREFORE, Plaintiffs pray for the following relief:

A.   That Defendants be preliminarily and permanently enjoined from enforcing the Group Bidding Rules including, but not limited to, an injunctive relief prohibiting Defendants from (a) treating affiliated members of a bidding group as separate bidders, each entitled to the same chance of an award, in the process of determining to whom a certificate will be awarded in the event of a tie bid or (b) allowing Master Bidders to satisfy the deposit requirement by making a deposit for its affiliates that is less than the deposit that is being charged to Independent Bidders, like the Plaintiffs;

B.   That the Group Bidding Rules be declared to be in violation of the U.S. Constitution and Florida law;

C.   That the Defendants be ordered to pay Plaintiffs' reasonable litigation costs, including attorney's fees, pursuant to 28 U.S.C. § 1988; and,

D.   That the Court order such other and further relief as the Court may deem appropriate in law or in equity.

This 3rd day of February, 2022.

/s/Nicole Deese Newlon
NICOLE DEESE NEWLON, FBN 832391
nnewlon@jclaw.com
JAMES JEFFREY BURNS, FBN 111395
jburns@jclaw.com
**JOHNSON, CASSIDY,**
**NEWLON & DECORT, P.A.**
2802 N. Howard Avenue
Tampa, Florida 33607
Telephone: (813) 699-4859
Facsimile: (813) 235-0462

and

BRUCE P. BROWN (motion for special
admission forthcoming)
bbrown@brucepbrownlaw.com
**BRUCE P. BROWN LAW LLC**
1123 Zonolite Road
Atlanta, Georgia 30306
Telephone: (404) 386-6856
*Lead Counsel*

*Counsel for Plaintiffs*