# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SSC8, LLC, and WMAC 2014, LLC,

      Plaintiffs,

v.                                      Case No: 8:22-cv-289-WFJ-AAS

SALLY L. DANIEL, Hernando County
Tax Collector; DAVID W. JORDAN,
Lake County Tax Collector; BRUCE
VICKERS, Osceola County Tax
Collector; J.R. KROLL, Seminole County
Tax Collector; CHRIS CRAFT, St. Lucie
County Tax Collector; and WILL
ROBERTS, Volusia County Tax Collector,

      Defendants.

_____/

## **ORDER**

      This matter comes before the Court following a bench trial on Plaintiffs

SSC8, LLC and WMAC 2014, LLC's claims against Defendants Hernando County

Tax Collector Sally L. Daniel, Lake County Tax Collector David W. Jordan,

Osceola County Tax Collector Bruce Vickers, Seminole County Tax Collector J.R.

Kroll, St. Lucie County Tax Collector Chris Craft, and Volusia County Tax

Collector Will Roberts (collectively, "Defendants").

      Citing concerns with the fairness of the group bidding rules utilized by

Defendants in their tax certificate auctions, Plaintiffs bring the following three claims[1]: a 42 U.S.C. § 1983 substantive due process claim (Count One); a § 1983 equal protection claim (Count Two); and a state law claim asserting a violation of section 197.432(6), Florida Statutes (Count Three). Seeking only injunctive relief, Plaintiffs request that this Court enjoin Defendants from enforcing their group bidding rules and declare the same rules as violative of the United States Constitution and Florida law.

On March 3, 3023, the Court held a bench trial on Plaintiffs' claims. At the Court's direction, the parties filed proposed findings of fact and conclusions of law, Dkts. 148 & 154, and written closing arguments, Dkts. 159 & 160. Having considered the applicable law, the parties' filings, and all evidence presented, the Court grants judgment in favor of Defendants and sets forth the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Plaintiffs are limited liability companies that bid on tax certificates auctioned by Defendants and other Florida county tax collectors. Dkt. 1 ¶¶ 3−4. A tax certificate, or tax lien, is a statutory lien that attaches to real property owned by

---

[1] At the bench trial, Plaintiffs stated that they had abandoned their fourth claim alleging a violation of section 197.432(7), Florida Statutes.

a delinquent taxpayer, thereby securing the delinquent real property taxes.

At Florida counties' annual tax certificate auctions, tax certificates are "awarded to the person who will pay the taxes, interest, costs, and charges and will demand the lowest interest rate" on a real property owner's effort to redeem. Fla. Stat. § 197.432(6). Proceeds from Defendants' auctions are used to fund their counties' schools, emergency services, and other important resources. The auctions, which Defendants conduct online, almost always result in ties between numerous bids offering a .25% annual interest rate. In the event of tied bids, section 197.432(6), Florida Statutes, provides that "tax collectors shall determine the method of selecting the bidder to whom the certificate will be awarded." Section 197.432(6) further provides that the use of a random number generator is an "acceptable method[]" for selecting a winning bidder. Defendants are among Florida's tax collectors who utilize a random number generator to resolve ties.

Though this system would seem to suggest that all tied bidders have an equal chance of being awarded a given tax certificate, this is not the case in Defendants' auctions. Defendants utilize group bidding rules that give "master bidders" an advantage over individual bidders—like Plaintiffs—in the event of a tie. Master bidders are parties that replicate themselves through subsidiary entities that are typically created for the sole purpose of bidding on tax certificates. Because a given master bidder may have hundreds of thousands of subsidiary entities, it is

3

common to have a master bidder in Defendants' auctions submit hundreds of thousands of identical bids through its subsidiary entities. The result is a tie between that master bidder's hundreds of thousands of bids and the bids of individual bidders. Though a master bidder and its subsidiary entities are fundamentally one and the same bidder, Defendants treat them as distinct bidders for purposes of their random number generators. Consequently, Defendants' group bidding rules almost always result in a master bidder being awarded the tax certificate through one of the many bids submitted by its subsidiary entities.

To create a subsidiary entity that qualifies as a "person" capable of bidding in a tax certificate auction under section 197.432(6), a party only needs an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS"). In the past, the IRS had no restrictions on the number of EINs a party could obtain in one day. Many master bidders took advantage of this and acquired thousands of EINs each day. As a result, master bidders that bid in Defendants' auctions have anywhere from hundreds of thousands to one million subsidiary entities. This was confirmed at trial by Defendants' witness John Garzone, who is the principal of a tax certificate investment company that owns a master bidding entity called Keys Funding. Keys Funding has roughly 1,000,000 subsidiary entities that it uses to submit bids in Defendants' auctions pursuant to Defendants' group bidding rules. Mr. Garzone admitted that nearly all of the 1,000,000

subsidiary entities were created for the sole purpose of bidding on tax certificates. Only a *de minimis* amount of those subsidiary entities serve a dual purpose, such as holding real estate.

The IRS now limits a given party to obtaining one EIN per day.[2] Additionally, the IRS has since expressed its disapproval of acquiring EINs for the sole purpose of creating entities to bid in tax certificate auctions. The IRS website explicitly states that "Employer Identification Numbers are issued for purposes of tax administration and are not intended for participation in any other activities (e.g., tax lien auction sales, lotteries, etc.)."[3] While not a formal rule or regulation, this statement deters independent bidders like Plaintiffs from seeking new EINs for tax certificate bidding purposes. Even if independent bidders choose to ignore the IRS's informal statement of disapproval and apply for EINs for tax certificate bidding, never in this lifetime will they collect enough EINs to rival master bidders' numbers.

Though the IRS seems to unofficially condemn the use of EINs solely for participation in tax certificate auctions, Defendants do not. Defendants repeatedly expressed that the IRS's aforementioned statement of disapproval is not a formal

---

[2] *Employer ID Numbers*, INTERNAL REVENUE SERVICE, https://www.irs.gov/businesses/small-businesses-self-employed/employer-id-numbers (last updated Sept. 1, 2022).
[3] *Apply for an Employer Identification Number (EIN) Online*, INTERNAL REVENUE SERVICE, https://www.irs.gov/businesses/small-businesses-self-employed/apply-for-an-employer-identification-number-ein-online (last updated Jan. 1, 2023).

rule and not of their concern. Defendants therefore continue to treat a master bidder and its subsidiary entities as distinct "person[s]" for purposes of submitting bids in their tax certificate auctions. At the same time, Defendants make no distinction between a master bidder and its subsidiary entities when collecting bid deposits. As permitted by section 197.432(7), all but one Defendant[4] require bidders to pay deposits equal to 10% of their intended purchase price. However, a master bidder is only required to pay a single deposit; it need not pay separate deposits for each bid submitted through its subsidiary entities. A master bidder and independent bidder therefore pay the same deposit amount for the same intended purchase value, despite the master bidder having submitted far more bids than the independent bidder and, consequently, having a far greater chance of being awarded the tax certificate in the inevitable event of a tie.

There is no doubt that Defendants' group bidding rules favor master bidders. As an example, Plaintiffs tied for the winning bids on over 10,000 tax certificates auctioned by Defendants in 2021. Also tied for the winning bids were over 3.4 million bids submitted by master bidders and their subsidiary entities. It comes as no surprise that Plaintiffs were not awarded a single one of the 10,000 tax certificates. It is likewise unsurprising that the majority of tax certificates were

---

[4] Lake County Tax Collector David W. Jordan does not require bidders to pay deposits in his county's tax certificate auctions.

awarded to master bidders. Indeed, prior to Hillsborough and Pinellas Counties abandoning group bidding, less than ten master bidders were awarded over 99.99% of tax certificates auctioned by the two counties in 2020.

At trial, Defendants feigned ignorance as to the inherent unfairness resulting from their group bidding rules. Defendants asserted that their group bidding rules treat every bidding "person" equally, given that subsidiary entities are "persons" for purposes of tax certificate auctions under section 197.432(6). Defendants largely refused to acknowledge the reality that subsidiary entities are just shells of a master bidder. And though Defendants testified that their group bidding rules promote efficiency and increase tax certificate sales, there is little—if any— support for this contention. Other Florida counties, including Hillsborough and Pinellas Counties, have ceased group bidding without issue. There is no indication that any Florida county that has abandoned group bidding has experienced decreased efficiency or sales. In fact, Defendants' expert, Lloyd McClendon, testified at the parties' preliminary injunction hearing before this Court that he was not aware of any difference in the performances of counties that allow group bidding and counties that do not. Dkt. 109 at 134.

Nevertheless, Defendant Seminole County Tax Collector J.R. Kroll testified that if his office abandoned its group bidding rules, it could be forced to handle millions of separate bids from master bidders and subsidiary entities that were

previously submitted together through group bidding. Yet there is no evidence that this has happened in other Florida counties that have ceased group bidding. Mr. McClendon previously testified before the Court that there was "not an appreciable difference" in demand for tax certificates in counties that allow group bidding and counties that do not. *Id.* Moreover, Mr. Kroll's concern is unrealistic for at least one practical reason: the deposits that he and four other Defendants require. Under these Defendants' current policies, a master bidder and its subsidiary entities would each need to submit their own deposits if group bidding was discontinued. Defendants cannot reasonably believe that a master bidder with 1,000,000 subsidiary entities would be willing to make 1,000,000 separate deposits for its subsidiary entities' independent bids in a single auction.

Other concerns offered by Defendants at trial made little sense. Volusia County Tax Collector Will Roberts testified that he would face lawsuits for excluding bidders if his county were to forego its group bidding rules. The only "bidders" Mr. Roberts would be "excluding" are shell entities that serve no purpose other than to replicate a master bidder's bid for the master bidder's benefit. Unsurprisingly, Defendants offered no evidence to suggest that any of these shell entities have brought, or threatened to bring, lawsuits against Florida counties that have moved away from group bidding.

Defendants' true concern appears to be related to appeasing master bidders.

Mr. Garzone, Defendants' witness, testified at trial that his tax certificate investment company would invest less capital in Florida tax certificate auctions if Defendants abandoned group bidding.[5] Such testimony is to be expected from an individual who controls a master bidder entity. As noted above, Mr. Garzone's master bidder entity, Keys Funding, has about 1,000,000 subsidiary entities that give Keys Funding a massive advantage in Defendants' auctions. If Defendants were to cease group bidding, Mr. Garzone's tax certificate investment company would lose this advantage and be forced to compete on a more-or-less even playing field with independent bidders.

Precisely why Defendants are staunchly opposed to stripping master bidders of their advantage is unclear to this Court. Whether a tax certificate is awarded to a master bidder or an independent bidder makes no difference in terms of Defendants' auction profits; a sold tax certificate is a sold tax certificate. As noted above, other Florida counties have ceased group bidding without consequence. Even the act of switching from group bidding to independent bidding is as simple as "flipping a switch" on the websites of Defendants' auction vendors. Despite the evidence undermining Defendants' stated concerns of abandoning their group bidding rules, Defendants have remained steadfast in their refusal to remedy the

---

[5] Though, Mr. Garzone's tax certificate investment company still purchased roughly $2.3 million in tax certificates in Broward County's 2022 tax certificate auction despite Broward County not permitting group bidding.

9

inequitable results of their auctions. Whether the Court has the authority to order Defendants to abandon their group bidding rules despite this refusal is a question of law underlying Plaintiffs' present claims.

## CONCLUSIONS OF LAW

At trial, Plaintiffs pursued three claims against Defendants. Count One is a § 1983 claim asserting that Defendants' group bidding rules violate substantive due process. Count Two is a second § 1983 claim in which Plaintiffs allege that Defendants' group bidding rules violate the Equal Protection Clause of the Fourteenth Amendment. Lastly, in Count Three, Plaintiffs contend that Defendants' method of resolving ties among bids violates section 197.432(6), Florida Statutes. Seeking only injunctive relief, Plaintiffs request that this Court declare Defendants' group bidding rules invalid and enjoin their use. The Court addresses Plaintiffs' claims in turn.

### I.    Substantive Due Process

In Count One, Plaintiffs allege that Defendants' group bidding rules constitute a substantive due process violation. Substantive due process protects "rights that are fundamental and 'implicit in the concept of ordered liberty.'" *Foley v. Orange Cnty.*, 638 F. App'x 941, 944 (11th Cir. 2016) (quoting *Greenbriar Vill., L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1262 (11th Cir. 2003)). Fundamental rights are rights created by the Constitution. *Kentner v. City of*

*Sanibel*, 750 F.3d 1274, 1279 (11th Cir. 2014) (citation omitted).

In the Eleventh Circuit, there exists a general rule that substantive due process claims concerning non-fundamental rights fail as a matter of law. *See id.* There is a limited exception to this rule for state-created rights infringed by a "legislative act," as opposed to an executive act. *Id.* at 1279−80. While executive acts typically apply to one person, such as a permit decision or termination of employment, legislative acts apply to a larger segment of society and generally include laws, zoning decisions, and executive regulations. *Id.* at 1280. Legislative acts that purportedly infringe upon state-created rights are subject to rational basis review. *See Leib v. Hillsborough Cnty. Public Transp. Comm'n*, 558 F.3d 1301, 1308 (11th Cir. 2009); *see also Ga. Elec. Life Safety & Sys. Ass'n v. City of Sandy Springs*, 965 F.3d 1270, 1275 (11th Cir. 2020).

Here, the parties agree that there is no fundamental right at issue. The parties disagree, however, as to whether there is a state-created right to the same, such that Plaintiffs' substantive due process claim is viable if Defendants' group bidding rules constitute a legislative act. The Court need not reach this question to resolve this claim, though. Even if there exists a state-created right to participate in a fair tax certificate auction, Defendants' group bidding rules must be upheld under rational basis review for reasons set forth below.

When assessing government action through the lens of rational basis review,

a court must "ask whether the government has the power or authority to regulate the particular area in question," and whether the proposed regulation is rationally related to a legitimate government purpose. *Ga. Elec. Life Safety*, 965 F.3d at 1275 (citation omitted). Plaintiff bears the burden of proving that the challenged government action bears no rational relationship to a legitimate government interest. This standard of review is highly deferential. *Kentner*, 750 F.3d at 1281 (quoting *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001)). Only in the most exceptional of circumstances will a legislative act be held unconstitutional under the rational basis test. *Id.* (citing *Williams*, 240 F.3d at 948). "[E]ven if the court is convinced that the political branch has made an improvident, ill-advised or unnecessary decision, it must uphold the act if it bears a rational relation to a legitimate government purpose." *United States v. Plummer*, 221 F.3d 1298, 1309 (11th Cir. 2000).

The Court turns first to the question of Defendants' power or authority to use group bidding. Section 197.432(1) provides that tax collectors may allow "proxy bidding," which is defined by section 197.102(1)(d) as "a method of bidding by which a bidder authorizes an agent, whether an individual or an electronic agent, to place bids on his or her behalf." While the Court rejects Defendants' assertion that "proxy bidding" and "group bidding" are synonymous, the Court agrees that group bidding is a form of proxy bidding. Group bidding is therefore permitted, though

12

not required, by section 197.432(1). However, this does not end the Court's inquiry. The ultimate issue is not whether group bidding is permissible, but whether *Defendants'* group bidding rules are permissible.

The Court therefore turns to the question of whether Defendants' group bidding rules are rationally related to a legitimate government interest such that they must be upheld under rational basis review. If there is any conceivable basis for Defendants to believe that their group bidding rules will accomplish a legitimate government interest, the group bidding rules must be upheld if rationally related to that interest. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313−15 (1993).

While Defendants' group bidding rules lead to unfair results among bidders, the Court finds that they survive rational basis review. It is reasonably conceivable that Defendants believed their group bidding rules would promote the legitimate government interests of conducting their auctions with efficiency and administrative ease. Though Defendants have no burden of proof under the rational basis test, they testified to their collective belief that their group bidding rules prevent their auctions from being overwhelmed by a flood of individuals bids. While evidence suggests that this concern has not been realized in other counties that have abandoned group bidding, a legislative judgment need not be supported by data or other evidence to withstand rational basis review. *See Ga. Elec. Life*

13

*Safety*, 965 F.3d at 1275. Indeed, rational basis review "tolerates an imprecise match between means and ends." *Id.* at 1276.

Even if Defendants were motivated to adopt their group bidding rules for some other purpose,  Defendants' true motivations are "entirely irrelevant for constitutional purposes." *See Beach Commc'ns*, 508 U.S. at 315. It is enough that efficiency and administrative ease are conceivable bases for Defendants' adoption of their group bidding rules. While a seemingly imprecise match, the Court finds that Defendants' group bidding rules are rationally related to those legitimate government interests. Accordingly, the Court must uphold the group bidding rules under rational basis review.

## II.   Equal Protection

The Court next turns to Plaintiffs' Count Two equal protection claim, which alleges that Defendants' group bidding rules violate the Fourteenth Amendment's Equal Protection Clause. Pursuant to the Equal Protection Clause, "[s]ocial and economic legislation . . . that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate government purpose." *Estate of McCall ex rel. McCall v. United States*, 642 F.3d 944, 950 (11th Cir. 2011) (quoting *Hodel v. Indiana*, 452 U.S. 314, 331 (1981)).

14

Here, the parties agree that rational basis review applies to Plaintiffs' equal protection claim, as there are no fundamental rights or suspect classifications at issue. Though the Court agrees with Plaintiffs' contention that Defendants' group bidding rules lead to unfair results, rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns*, 508 U.S. at 313. Given that the Court already determined in its Count One analysis that Defendants' group bidding rules are rationally related to a legitimate government interest such that they must be upheld under rational basis review, the Court is constrained to enter judgment for Defendants on Plaintiffs' equal protection claim.

## III.  Section 197.432(6)

Finally, the Court considers Plaintiffs' Count Three claim that alleges Defendants' method of selecting a winning bidder in the event of tied bids violates section 197.432(6), Florida Statutes. That section provides in relevant part:

> If multiple bidders offer the same lowest rate of interest, the tax collector shall determine the method of selecting the bidder to whom the certificate will be awarded. Acceptable methods include the bid received first or the use of a random-number generator.

Fla. Stat. § 197.432(6).

Plaintiffs take issue with Defendants' recognition of master bidders and their subsidiary entities as distinct bidders for purposes of resolving ties through their random number generators. Because master bidders and

15

their subsidiary entities engaging in group bidding are not truly "multiple bidders," but instead just a master bidder disguised in various forms, Plaintiffs contend that Defendants' current system of resolving ties is not an "acceptable method" under section 197.432(6).

While Plaintiffs' point is well-taken, the Court finds that Defendants' current method of resolving ties does not run afoul of the plain language of section 197.432(6). By stating that "acceptable methods *include* the bid received first or the use of a random-number generator," the Florida legislature provided tax collectors with discretion to select a tie-breaking method. *See* Fla. Stat. § 197.432(6) (emphasis added). Given that one expressly permitted method of breaking a tie is selecting the bid first received, this discretion is not limited to the selection of a method that affords every tied bidder an equal chance of being awarded a tax certificate following a tie.

Given section 197.432(6) does not require Defendants to utilize a random number generator and affords Defendants ample discretion in choosing a method of resolving ties, judgment is due to be entered for Defendants on Count Three.

16

## CONCLUSION

Based on the foregoing, Defendants are entitled to judgment on Plaintiffs'

claims. The Clerk is directed to enter judgment accordingly and close the case.

**DONE AND ORDERED** at Tampa, Florida, on March 13, 2023.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record

17